IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Earl Rivers, | ) | Civil Action No. 8:10-cv-314-RMG-JDA |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court for a Report and Recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., and Title 28, U.S.C. § 636(b)(1)(B).[1] Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security ("the Commissioner"), denying Plaintiff's claims for disability insurance benefits ("DIB") and supplemental security income ("SSI"). For the reasons set forth below, it is recommended that the decision of the Commissioner be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and § 1383(c)(3), and the case be remanded to the Commissioner for an award of benefits to Plaintiff based on a disability commencing October 1, 2003. *See Melkonyan v. Sullivan*, 501 U.S. 89, 99–100 (1991) (stating that a district may remand in conjunction with reversing the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g)); *Davis v. Astrue*, No. 2:07-1621, 2008 WL 1826493 (D.S.C. Apr. 23, 2008) (adopting a report and recommendation

---

[1]A Report and Recommendation is being filed in this case, in which one or both parties declined to consent to disposition by a magistrate judge.

recommending reversing the Commissioner's decision in a DIB case and remanding to the Commissioner for an award of benefits).

## **PROCEDURAL HISTORY**

Plaintiff initially filed claims for DIB and SSI on June 25, 2002 [R. 82], which were subsequently denied by decision dated January 8, 2004 after hearing by administrative law judge ("ALJ") Philip Wright [R. 79–89]; Plaintiff did not appeal that decision [Doc. 16 at 2].

Plaintiff filed a second set of DIB and SSI claims on February 12, 2004 [R. 165–68[2]], alleging disability as of October 1, 2003 [R. 165]. The claims were initially denied on March 17, 2004 [R. 54–58[3]] and were denied on reconsideration by the Social Security Administration ("the Administration") in January 2005 [R. 59–63]. A timely request for hearing was made, and on September 6, 2005, ALJ Edward T. Morriss held a hearing on Plaintiff's claims. [R. 718–38.]

On February 24, 2006, the ALJ issued a decision, finding Plaintiff was not disabled for purposes of the Social Security Act ("the Act") [R. 64–74], and Plaintiff requested review of that decision [R. 123, 125]. In the meantime, Plaintiff filed another set of disability applications on April 24, 2006, and the state agency awarded Plaintiff benefits based on these applications. [*See* R. 23, 32, 127.] On January 8, 2008, the Appeals Council granted Plaintiff review of the ALJ's decision, combined the claims, and remanded them for reconsideration by the ALJ. [R. 30–34, 127–29.]

---

[2]Plaintiff's February 12, 2004 SSI application was not available for inclusion in the record. [Doc 16 at 2 n.1.]

[3] The initial denial of Plaintiff's February 12, 2004 SSI application was not available for inclusion in the record. [Doc. 16 at 2 n.2.]

The ALJ conducted a second hearing on August 12, 2008, which Plaintiff attended, along with his attorney and a vocational expert. [R. 739–70.] By decision dated September 24, 2008, the ALJ determined Plaintiff was not disabled under §§ 216(i), 223(d) and 1614(a)(3)(A) of the Act. [R. 20–29.] Following his review of the evidence, the ALJ found Plaintiff had severe impairments, including status post lumbar discectomy and fusion and borderline intellectual functioning [R. 26, Finding 3], but Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (part A) [R. 26, Finding 4]. The ALJ also found Plaintiff retained the residual functional capacity to perform light work but, based on Plaintiff's "special education background," concentration deficits would further limit him to the performance of unskilled work. [R. 27, Finding 5.] With these restrictions, the ALJ found Plaintiff was able to perform his past relevant work as a security guard. [R. 28–29, Finding 6.]

On January 21, 2010, the ALJ's findings became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review of the hearing decision. [R. 6–8; 20 C.F.R. §§ 404.981, 416.1481.] Plaintiff filed this action for judicial review on February 10, 2010. [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff contends that the Commissioner erred by failing to (1) find Plaintiff met Listing 12.05C and (2) weigh the opinions of Plaintiff's treating physicians. [Doc. 15 at 11–17.] Plaintiff argues that this Court should reverse the ALJ's decision and award Plaintiff benefits outright. [*Id.* at 17–18.]

The Commissioner contends that substantial evidence supports the ALJ's finding that Plaintiff does not meet Listing 12.05C [Doc. 16 at 16–21], one such piece of evidence being that Plaintiff's work history belies a finding of "deficits in adaptive behavior," as required by Listing 12.05 [Doc. 16 at 21]. Further, the Commissioner cites to the ALJ's reasoning that Plaintiff presented no evidence that he experienced such deficits prior to attaining the age of twenty-two. [*Id.* at 17–18.] The Commissioner concedes the ALJ erred in not discussing the opinions of Plaintiff's treating physicians but contends that such error is harmless given the deficiencies of those opinions. [*Id.* at 23–24.] The Commissioner further argues that this Court would act contrary to established law if it made an outright award of benefits to Plaintiff. [*Id.* at 24–25.]

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963)) ("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is

4

evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "'allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ),'" not on the reviewing court. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse a Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994). Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'" *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42

U.S.C. § 405(g)).  Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose."  *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g).  *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision).  To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim. *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the plaintiff's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the plaintiff disabled).   Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four may be appropriate to allow the Commissioner to explain the basis for the decision.  *See Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant

may produce further evidence on remand.").  After a remand under sentence four, the court

enters a final and immediately appealable judgment and then loses jurisdiction.  *Sargent*,

941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be
> taken before the Commissioner of Social Security, but only
> upon a showing that there is new evidence which is material
> and that there is good cause for the failure to incorporate such
> evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g).  A reviewing court may remand a case to the Commissioner on the

basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the

determination of disability at the time the application was first filed; (2) the evidence is

material to the extent that the Commissioner's decision might reasonably have been

different had the new evidence been before him; (3) there is good cause for the claimant's

failure to submit the evidence when the claim was before the Commissioner; and (4) the

claimant made at least a general showing of the nature of the new evidence to the

reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. §

405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d

26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by*

*amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of*

*Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[4]  With remand under sentence

---

[4]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been
superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the
requirements outlined in *Borders* when evaluating a claim for remand based on new evidence.  *See, e.g.*,
*Ashton v. Astrue*, No. 6:10-cv-152, 2010 WL 5478646, at *8 (D.S.C. Nov. 23, 2010); *Washington v. Comm'r
of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health &
Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992).  Further, the Supreme Court of the United
States has not suggested *Borders*' construction of § 405(g) is incorrect.  *See Sullivan v. Finkelstein*, 496 U.S.

six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98. The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings. *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a disability. 42 U.S.C. § 423(a). "Disability" is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.     The Five Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims). The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings

---

617, 626 n.6 (1990). Accordingly, the Court will apply the more stringent *Borders* inquiry.

8

of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. Through the fourth step, the burden of production and proof is on the claimant.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).  The claimant must prove disability on or before the last day of her insured status to receive disability benefits.  *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969).  If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience.  *Id.*  If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary.  20 C.F.R. §§ 404.1520(a), 416.920(a)(4); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

## A.    *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. §§ 404.1572(a), 416.972(a)—and gainful—done for pay or profit, whether or not a profit is realized, 20 C.F.R. §§ 404.1572(b), 416.972(b).  If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity.  20 C.F.R. §§ 404.1574–.1575, 416.974–.975.

**B.    *Severe Impairment***

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  See 20 C.F.R. §§ 404.1521, 416.921.  When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments.  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).  The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses. *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them").  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments.").  If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process."  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

**C.    *Meets or Equals an Impairment Listed in the Listings of Impairments***

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. §§ 404.1509 or 416.909, the ALJ will find the claimant

disabled without considering the claimant's age, education, and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(a)(4)(iii), (d).

### D.    *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant." *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995). At this step of the evaluation, the ALJ compares the claimant's residual functional capacity[5] with the physical and mental demands of the kind of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work. 20 C.F.R. §§ 404.1560(b), 416.960(b).

### E.    *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *See* 20 C.F.R. §§ 404.1520(f)–(g), 416.920(f)–(g); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids"). Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant nonexertional factors.[6] 20

---

[5]Residual functional capacity is "the most [a claimant] can do despite [his] limitations." 20 C.F.R. § 404.1545(e)

[6]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs. 20 C.F.R. § 404.1569a. A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands. *Id.* Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing. *Id.*

C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving exertional limitations).  When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines.  *Gory*, 712 F.2d at 931.  In such a case, the Commissioner must use a vocational expert to establish the claimant's ability to perform other work.  20 C.F.R. §§ 404.1569a, 416.969a; *see Walker*, 889 F.2d at 49–50 ("Because we have found that the grids cannot be relied upon to show conclusively that claimant is not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy.").  The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform."  *Walker*, 889 F.2d at 50.  For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments."  *Id.* (citations omitted).

## II.  Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  The ALJ is required to inquire fully into each relevant issue.  *Snyder*, 307 F.2d at 520.  The performance of this duty is particularly important when a claimant appears without counsel.  *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir.

1980).  In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Id.* (internal quotations and citations omitted).

### III.     Treating Physicians

The opinion of a claimant's treating physician must "be given great weight and may be disregarded only if there is persuasive contradictory evidence" in the record.  *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Foster v. Heckler*, 780 F.2d 1125, 1130 (4th Cir. 1986) (holding that a treating physician's testimony is entitled to great weight because it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time); *Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983)).  If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence.  *Craig*, 76 F.3d at 590.  Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See id.* (holding there was

13

sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(d), 416.927(d). In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Mitchell*, 699 F.2d at 187 (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). An ALJ determination coming down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways. *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir.1986).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. 20 C.F.R. §§ 404.1527(e), 416.927(e). However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. *Id.*

14

**IV.     Medical Tests and Examinations**

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. §§ 404.1517, 416.917; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986).  The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability.  20 C.F.R. §§ 404.1517, 416.917.  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  *Id.*

**V.     Pain**

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  In evaluating claims of disabling pain, the ALJ must proceed in a two-part analysis.  *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion).  First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'"  *Id.* (quoting *Craig,* 76 F.3d at 594).  Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as

15

a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain." *Id*. (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the Fourth Circuit's "pain rule," it is well established that "subjective complaints of pain and physical discomfort can give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs." *Coffman*, 829 F.2d at 518. The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. §§ 404.1528, 416.928. Indeed, the Fourth Circuit has rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges within the circuit a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v. Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990). The Commissioner thereafter issued the following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR) 88-13, Titles II and XVI: Evaluation of Pain and Other Symptoms:
> 
> ...
> 
> **FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself,

16

> support a finding of disability. Objective medical evidence of
> pain, its intensity or degree (i.e., manifestations of the
> functional effects of pain such as deteriorating nerve or muscle
> tissue, muscle spasm, or sensory or motor disruption), if
> available, should be obtained and considered. Because pain
> is not readily susceptible of objective proof, however, the
> absence of objective medical evidence of the intensity,
> severity, degree or functional effect of pain is not
> determinative.

SSR 90-1p, 55 Fed. Reg. 31, 898-02 (Aug. 6, 1990), *superseded by* SSR 96-7p, 61 Fed.

Reg. 34,483-01 (July 2, 1996) ("If an individual's statements about pain or other symptoms

are not substantiated by the objective medical evidence, the adjudicator must consider all

of the evidence in the case record, including any statements by the individual and other

persons concerning the individual's symptoms."); *see* 20 C.F.R. §§ 404.1529(c)(1)–(c)(2),

416.929(c)(1)–(c)(2).

## VI.    Credibility

The ALJ must make a credibility determination based upon all the evidence in the

record. Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ

must articulate specific and adequate reasons for doing so, or the record must be obvious

as to the credibility finding. *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985).

Although credibility determinations are generally left to the ALJ's discretion, such

determinations should not be sustained if they are based on improper criteria. *Breeden*,

493 F.2d at 1010 ("We recognize that the administrative law judge has the unique

advantage of having heard the testimony firsthand, and ordinarily we may not disturb

credibility findings that are based on a witness's demeanor. But administrative findings

17

based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

## APPLICATION AND ANALYSIS

### Listing 12.05C

Plaintiff complains that the ALJ failed to properly evaluate whether Plaintiff met 12.05C of the listings.[7]  [Doc. 15 at 11–16.]  The Court agrees.

The ALJ specifically considered whether Plaintiff met Listing 12.05 but decided Plaintiff's records contained no "evidence of adaptive deficits and no real evidence of manifestation during the developmental phase before age 22."  [R. 26.]  The ALJ went on to state that he rejected the validity of Dr. Waid's assessment of Plantiff's lifelong intellectual abilities due to Plaintiff's "extensive work history."  [R. 27.]  Further, the ALJ addressed Plaintiff's testimony that he had been in special education classes as follows:

> When the claimant applied for benefits, he reported that he had completed the ninth grade and earned a GED.  There was no indication that he had attended special education[8] or that he was illiterate.  While the claimant may have been in special education classes, he still had a long work history which the vocational expert indicated was skilled as a cement finisher and semi-skilled as a security guard.  Consequently, I find that the claimant's work history demonstrates the absence of deficits in adaptive functioning.

[R. 28 (footnote added); *see also* R. 746.]  As discussed below, in reaching this conclusion, the ALJ ignored substantial evidence indicating that Plaintiff exhibited deficits in adaptive

---

[7] The Listing of Impairments is applicable to SSI claims pursuant to 20 C.F.R. §§ 416.911 and 416.925.

[8] Nevertheless, the ALJ found Plaintiff was limited by concentration difficulties based on his "special education background."  [R. 27, Finding 5.]

18

functioning during his developmental period; improperly relied on work history to deny benefits; and discredited Plaintiff's IQ scores without sufficient explanation.

To determine whether the plaintiff's impairments meet or equal a listed impairment, the ALJ identifies the relevant listed impairments and compares the listing criteria with the evidence of the plaintiff's symptoms. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (stating that without identifying the relevant listings and comparing the plaintiff's symptoms to the listing criteria, "it is simply impossible to tell whether there was substantial evidence to support the determination"); *Beckman v. Apfel*, No. WMN-99-3696, 2000 WL 1916316, at *9 (D. Md. Dec. 15, 2000) (unpublished opinion) ("In cases where there is 'ample factual support in the record' for a particular listing, the ALJ must provide a full analysis to determine whether the claimant's impairment meets or equals the listing." (quoting *Cook*, 783 F.2d at 1172)).

### Criteria of Relevant Listing

Listing 12.05 reads as follows:

> Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
>
> Or
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;

Or

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

Or

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

> 1. Marked restriction of activities of daily living; or
>
> 2. Marked difficulties in maintaining social functioning; or
>
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
>
> 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

To meet Listing 12.05, a claimant must satisfy the "diagnostic description" in the introductory paragraph and any one of the four sets of criteria—A, B, C, or D. *Id.* § 12.00A. The diagnostic description describes mental retardation as "significantly sub-average general intellectual functioning with deficits in adaptive functioning." *Id.* § 12.05. The Administration "has never adopted a standard of measurement for the term 'deficits in adaptive functioning' in the capsule definition of Listing 12.05." *Wall v. Astrue*, 561 F.3d 1048, 1073 (10th Cir. 2009) (Holloway, J., dissenting). The Administration has noted that the definition of mental retardation in its Listings is "consistent with, if not identical to, the

definitions of [mental retardation] used by the leading professional organizations."[9] Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20,018-01, 20,022 (Apr. 24, 2002).  *But see Cox v. Astrue*, 495 F.3d 614, 618 n.4 (8th Cir. 2007) (noting that "the medical standard for mental retardation is not identical to the legal standard").   Medical professional organizations have stated that deficits in "adaptive functioning" can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.  *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002) (quoting American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 41 (4th ed., Text Revision 2000) [hereinafter DSM-IV-TR]) (noting the similarity between the American Association on Mental Retardation and the American Psychiatric Association's definitions of mental retardation[10]).  Further, in addition to producing deficits in adaptive functioning, the claimant's mental retardation must have "initially manifested

---

[9]The Administration explained that, in the United States, each of the four major professional organizations has its own definition.  Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20,018-01, 20,022 (Apr. 24, 2002).  However, although each requires "significant deficits in intellectual functioning," which is evidenced by low IQ scores, "age of onset and the method of measuring the required deficits in adaptive functioning differ among the organizations."  *Id.*  Moreover, the Administration has discussed the definitions utilized by the American Psychiatric Association but has specifically stated that it endorses no organization's methodology over another.  *Id.*  In fact, when the Administration revised the listings in 2002, it declined a proposal to incorporate the American Psychiatric Association definition of mental retardation into Listing 12.05.  *Id.*  The Administration's definition "establishes the necessary elements, while allowing use of any of the measurement methods recognized and endorsed by the professional organizations." *Id.*  In this case, Plaintiff and the Commissioner refer to the definition in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders*.  [Doc. 15 at 14; Doc. 16 at 27.]

[10]The Fourth Circuit has approved the use of the American  Association of Mental Retardation's standards for measuring adaptive skills in reviewing the denial of a writ of habeas corpus under 28 U.S.C. § 2254.  *See Green v. Johnson*, 515 F.3d 290, 302 (4th Cir. 2008), *cert. denied*, 128 S. Ct. 2999 (2008) (finding Virginia Supreme Court's determination that the petitioner had failed to show he was mentally retarded was not contrary to clearly established federal law).

during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."[11]  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

To meet the criteria of 12.05C, the claimant must establish he has an IQ between 60 and 70 and "a physical or other mental impairment imposing an additional and significant work-related limitation of function."  *Id.* § 12.05C.  The presence of a significant work-related limitation of function that renders the claimant unable to perform his past relevant work satisfies the "additional and significant" requirement of Listing 12.05C. *Rainey v. Heckler*, 770 F.2d 408, 410–11 (4th Cir. 1985).

### Plaintiff's Symptoms

#### Adaptive Deficits

The DSM-IV-TR defines mental retardation as a combination of "significantly subaverage intellectual functioning (an IQ of approximately 70 or below)" and "significant limitations in adaptive functioning" in at least two skill areas.  DSM-IV-TR, *supra*, at 41.  As previously noted, these skill areas include communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.  *Id.*

In this case, the ALJ found  no evidence of deficits in Plaintiff's adaptive functioning. [R. 26.]  However, this finding is not supported by substantial evidence in the record before the ALJ, and evidence submitted to the Appeals Council also contradicts the ALJ's finding.

The evidence in the record that was before the ALJ showed Plaintiff did poorly in school, was aggressive in school, had trouble with his speech, and was found to be

---

[11]Medically, a diagnosis of mental retardation requires a finding that the patient's intellectual limitations began in childhood.  DSM-IV-TR, *supra*, at 54.

functionally illiterate, which indicates limitations in Plaintiff's functional academic skills, social/interpersonal skills, and communication—three of the adaptive skill areas.  Plaintiff had a lot of difficulty in school and dropped out in the ninth grade, but he received a GED through the Job Corp shortly thereafter.[12]  [R. 43–44, 230–34, 711.]  School records from the Beaufort County School District showed that Plaintiff was identified as a special needs student in the 1960's; he underwent repetitive evaluations in his first three years of education. [R. 43, 231–34.] Academic achievement testing in October 1973, when Plaintiff was fourteen, revealed Plaintiff to be severely deficient in his intellectual abilities.  [*Id.*] Teachers' observations in the school records suggested longstanding learning difficulties as Plaintiff was assessed as being "inattentive with marked aggressiveness and speech defect."  [R. 43, 231.]  In the ninth grade, Plaintiff was failing English and physical science and had a D in general math and in physical education.  [R. 43, 233.]  Plaintiff even failed driver's education.  [R. 233.]  Plaintiff ultimately dropped out of school without completing ninth grade.  [R. 233.]

---

[12] The Court notes that in his April 2006 opinion letter to Plaintiff's counsel, Dr. Waid described Plaintiff's GED as follows:

> [Plaintiff] left formal educational pursuits following the 9th grade and reportedly obtained a GED as part of being in the job corp.  The job corp generally desires to have clients complete their GED.  Unfortunately, during the course of my 25 years of evaluations in the state of South Carolina, I have discovered that the GEDs obtained in the job corp are not competitive GEDs.  In many ways, it is very much like a social promotion in school which also frequently occurs in the South Carolina school system.

[R. 43–44.] Moreover, Dr. Brabham described the GED by stating, "[I]t has long been my experience, and that of many of my educational and psychology colleagues, that a GED from the Job Corp 30-plus years ago is, frankly speaking, a useless credential, and has no factual basis as to actual academic achievements."  [R. 711 (emphasis omitted).]

After the denial of Plaintiff's February 12, 2004 application for disability benefits, Ms. Suggs, Plaintiff's counsel at the time, suspected Plaintiff had low intellectual and academic functioning, and in May 2004, she made arrangements for Plaintiff to undergo formal testing by clinical psychologist L. Randolph Waid, Ph.D. [R. 330–31.] A Wechsler Adult Intelligence Scale-III ("WAIS-III") analysis revealed Plaintiff was deficient in performance of certain tasks—working memory was assessed at the seventh percentile, processing speed at the third percentile, and perceptual organization skills and verbal comprehension skills at the first percentile. [R. 330.] Academic achievement testing revealed Plaintiff to be functionally illiterate. [R. 331.] Plaintiff was observed to put forth good effort, and Dr. Waid viewed the scores as a valid depiction of Plaintiff's intellectual and academic skills. [R. 331.] The validity of Plaintiff's efforts in testing was assessed via the administration of symptom validity testing using the Test of Memory Malingering ("TOMM"), the results of which were consistent with observations that Plaintiff provided good effort. [R. 331.]

In January 2005, state agency psychologist Samuel Goots, Ph.D., reviewed the medical evidence, completed a psychiatric review technique form, and assessed Plaintiff's mental residual functional capacity. [R. 401–18.] Dr. Goots found Plaintiff had borderline intellectual functioning, and Plaintiff's IQ scores were in the range of mental retardation. [*Id.*] Without providing any reasoning, Dr. Goots concluded that there was no clear evidence of deficits in Plaintiff's adaptive functioning prior to age eighteen. [R. 402.]

In January 2009, Plaintiff's present counsel arranged for Plaintiff to be evaluated by clinical psychologist and vocational expert Robert E. Brabham, Ph.D [R. 710–17]; this report was submitted to the Appeals Council and was not in the record before the ALJ [R. 5, 9]. Dr. Brabham reviewed the entire medical and vocational record, conducted a clinical

24

interview and evaluation, and performed a new round of intellectual and achievement testing. [R. 710–17.] Achievement testing administered by Dr. Brabham confirmed Plaintiff was functionally illiterate; Plaintiff could spell only four words in testing performed by Dr. Brabham and none more than four-letters in length.  [R. 714.]

The record contains substantial evidence to support a finding that Plaintiff displayed defects in adaptive functioning.  Drs. Waid and Brabham both submitted reports to the record agreeing that Plaintiff only advanced in learning capacities—in reading, spelling, and arithmetic—to minimal educational levels.  Likewise, Dr. Goots observed Plaintiff had borderline intelligence and IQ scores in the mental retardation range.  The record is also clear that Plaintiff was found to be functionally illiterate, which is itself a deficit in adaptive functioning.  *Davis v. Astrue*, No. 2:07-1621, 2008 WL 1826493, at *4 (D.S.C. Apr. 23, 2008) (citing DSM-IV-TR, *supra*, at 40). Moreover, none of these medical professionals put forth any opinion that Plaintiff was faking low intelligence or that the IQ scores were lower than expected based on Plaintiff's academic and vocational background.  Because there is no evidence in the record contradicting Dr. Waid's and Dr. Brabham's reports or Plaintiff's school records, the ALJ's denial based on a failure to show a deficit in adaptive functioning is not supported by substantial evidence.

*Manifestation During the Developmental Phase*

The Fourth Circuit has recognized that the regulations "expressly define mental retardation as denoting 'a lifelong condition.'"  *Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00B4).  A claimant does not have to present evidence of an IQ test prior to his or her twenty-second birthday to be found mentally disabled under Listing 12.05.  *See id.*  Evidence of illiteracy, despite a

25

claimant's education, supports a finding that the claimant's mental retardation occurred before age twenty-two. *Turner v. Bowen*, 856 F.2d 695, 699 (4th Cir. 1988); *see Maresh v. Barnhart*, 438 F.3d 897, 900 (8th Cir. 2006) (relying on school records and an IQ examination administered after the claimant's developmental period to establish that the claimant exhibited deficits in adaptive functioning prior to age twenty-two). "[I]n the absence of any evidence of a change in a claimant's intelligence functioning, it *must be assumed* that the claimant's IQ [] remained relatively constant." *Luckey v. U.S. Dep't of Health & Human Servs.*, 890 F.2d 666, 668 (4th Cir. 1989) (citing *Branham*, 775 F.2d at 1274).

Here, the ALJ pointed to no evidence in the record to conclude that Plaintiff's IQ changed. The ALJ merely disregarded Plaintiff's IQ tests, declining to accept "the IQ scores of Dr. Waid as a valid indicator of [Plaintiff's] life-long abilities" [R. 27], without explanation or contradictory evidence to refute the reliability of Plaintiff's test results. While Dr. Goots' evaluation is some evidence in the record that Plaintiff's mental impairment did not manifest itself before age eighteen [R. 402], this one report does not constitute substantial evidence. Further, the quality and character of Plaintiff's work as a concrete finisher, custodian, and security guard[13] hardly overcomes the presumption that Plaintiff's IQ was constant over his life, and the evidence that he is functionally illiterate points to mental retardation occurring before age twenty-two. *See Turner*, 856 F.2d at 699.

The ALJ also concluded there was no evidence of significant limitations during the developmental period because Plaintiff had a significant work history. [R. 26–27.] Where,

---

[13]Despite his problems in school, Plaintiff went on to be gainfully employed, working primarily as a concrete finisher. [R. 712, 724, 733, 748–49.] Plaintiff worked for a while as a security guard at a convenience store run by a church friend; the job consisted primarily of watching out for shoplifters and did not involve a full range of security guard duties. [R. 201–02, 713, 731–32, 746–48.]

however, the Listing 12.05C criteria are met, the Commissioner "may not rely upon previous work history to prove non-disability . . . : 'When a claimant for benefits satisfies the disability listings, benefits are due notwithstanding any prior efforts of the claimant to work despite the handicap.'"[14] *Luckey*, 890 F.2d at 669 (quoting *Murphy v. Bowen*, 810 F.2d 433, 438 (4th Cir. 1987)); *see also Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (stating that when a claimant satisfies a listing by meeting all its specified medical criteria, she presumably qualifies for benefits); *Ambers v. Heckler*, 736 F.2d 1467, 1469–70 (11th Cir. 1984) (finding that a mentally retarded claimant who was gainfully employed in the past is disabled upon the cessation of employment).  As more fully explained by one district court:

> [The] DSM-IV and Listing 12.05(C) assume many, if not most, mildly mentally retarded individuals will be able to work. However, they recognize that some mildly mentally retarded individuals may be unable to work where they have "a physical or other mental impairment imposing an additional and significant work-related limitation of function."  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05(C).  This listing implies that such an individual will be able to work unless he has, or until he develops, a severe physical or additional mental impairment.  *Therefore, the fact that plaintiff has a history of continuous employment in the past is irrelevant to whether he has subsequently become disabled due to the development of additional severe impairments.*

---

[14]As to Plaintiff's work history, some Courts of Appeals do allow such evidence to be used to challenge a claimant's IQ score.  *See, e.g., Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998) (citing *Mackey v. Shalala*, 47 F.3d 951, 953 (8th Cir. 1995) ("Nothing in [claimant's] prior work history or educational background . . . supports an I.Q. so low as to reflect mild mental retardation."); *Popp v. Heckler*, 779 F.2d 1497, 1499–1500 (11th Cir. 1986) (finding a claimant's IQ scores were properly discredited where the scores were inconsistent with the claimant's college record and work history as an algebra teacher); *Muse v. Sullivan*, 925 F.2d 785, 789–90 (5th Cir. 1991) (finding IQ results questionable in light of the claimant's work experience, education, and demeanor at the hearing)).  However, reliance on a claimant's work history to reject IQ scores is rejected in the Fourth Circuit.  *See Luckey*, 890 F.2d at 669 (quoting *Murphy v. Bowen*, 810 F.2d 433, 438 (4th Cir. 1987)).

*Muntzert v. Astrue*, 502 F. Supp. 2d 1148, 1158 (D. Kan. 2007) (emphasis added); see also Davis, 2008 WL 1826493, at *4 ("While [the claimant] had been able to function in a work setting, listing 12.05C anticipates that a [claimant] of limited intellectual ability will be more severely limited, and disabled when faced with other severe impairments."). Therefore, the ALJ's use of work history to deny benefits constitutes the application of an improper legal standard and does not constitute substantial evidence to support the ALJ's conclusion. Accordingly, the Court finds the ALJ's conclusion that there was no evidence of manifestation during Plaintiff's developmental phase is unsupported by substantial evidence.

*IQ Score*

To meet Listing 12.05C, the claimant must show a "valid verbal, performance, or full scale IQ of 60 through 70." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C. The ALJ does not determine whether IQ scores are legitimate. *See Jackson v. Astrue*, No. 8:08-2855, 2010 WL 500449, at *5 (D.S.C. Feb. 5, 2010) (finding the ALJ improperly interpreted evidence when the ALJ, on his own, not by weighing conflicting medical opinions, found the plaintiff's daily activities did not comport with her IQ scores); *see also Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("[A]n ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so."); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (noting an ALJ is "not qualified to interpret raw medical data in functional terms") (citation omitted); *Davis v. Heckler*, 884 F.2d 1394, 1989 WL 104466, at *4 (9th Cir. Sept. 1, 1989) (unreported table decision) (finding an ALJ impermissibly substitutes his opinion for that of a treating physician when the ALJ rejects a physician's

opinion that rests on substantial medical evidence); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985) ("[A]n ALJ is not free to set his own expertise against that of a physician who presents competent evidence."). Although the regulations permit the ALJ to consider evidence in addition to an IQ score, a general discussion of the claimant's activities and an ALJ's intuition are not sufficient to overcome medical evidence; the ALJ cannot substitute his own judgment and disregard IQ scores. *Dozier v. Comm'r of Soc. Sec.*, 736 F. Supp. 2d 1024, 1037 (D.S.C. 2010). As stated in *Maybank v. Astrue*,

> Generally, the results obtained by a licensed psychologist following administration of accepted intelligence tests are entitled to considerable weight in Social Security cases although they are not required to be accepted. The Commissioner may, however, reject such scores if they are inconsistent with other substantial evidence in the record such as conflicting professional opinions or other record evidence indicating that the claimant is historically higher achieving or has more advanced functional capacities than would be expected from someone with a below-average I.Q. Indeed, test results of this sort should be examined to assure consistency with daily activities and behavior.

No. 4:08-643, 2009 WL 2855461, at *11 (D.S.C. Aug. 31, 2009) (internal citations omitted); *see also Markle v. Barnhart*, 324 F.3d 182, 186 (3d Cir. 2003) (same); *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998) (citations omitted) (same).

In this case, there is no evidence in the record that indicates Plaintiff's IQ scores are conflicting or inconsistent with his functional capacities. Intellectual testing performed in 1967 and 1968—when Plaintiff was eight and nine years of age—resulted in full scale IQ scores of 53, 59, and 53. [R. 43, 232.] Additionally, later in his life, Plaintiff's IQ scores

were consistently found to be in the sixties—by Dr. Waid in 2004[15] [R. 330] and Dr. Brabham in 2009[16] [R. 714]—indicating Plaintiff's IQ has not changed since his childhood, *see Luckey*, 890 F.2d at 668.  There are no conflicting psychological reports nor any other IQ scores specifically calling into doubt the validity of Dr. Waid or Dr. Brabham's scoring.  Neither Dr. Waid,  Dr. Brabham, nor any other treating or consulting medical professional raised any doubt as to Plaintiff's efforts on the testing or as to his low intellectual function. *Cf. Clay v. Barnhart*, 417 F.3d 922, 930–31 (8th Cir. 2005) (involving two different sets of IQ scores, where one doctor's found that the claimant failed to put forth serious effort on the IQ test and the other doctor found his IQ results where invalid because he was convinced the claimant was malingering); *Johnson v. Barnhart*, 390 F.3d 1067, 1071 (8th Cir. 2004) (holding ALJ properly discounted results of two IQ tests where there was evidence the claimant malingered during the tests).  In his effort to discredit Plaintiff's IQ scores, the ALJ heavily relied on the fact Plaintiff received a GED.  [R. 26.] The Court finds no basis in the law for such reliance in the presence of Plaintiff's consistently low IQ scores and the absence of evidence of malingering.

Additionally, the Court notes the Commissioner has recognized that an individual's IQ tends to stabilize by age sixteen; that consistency among sub-test scores increases confidence in the test's accuracy; and that the practice of inferring low IQ during the developmental period from testing done later in life has been approved. *Davis*, 2008 WL 1826493, at *4 (citing 65 Fed. Reg. 50,746, 50,772 (Aug. 20, 2000)).  Therefore, the ALJ's

---

[15] In May 2004, Plaintiff's test scores revealed a full scale IQ of 64, verbal IQ of 66, and performance IQ of 67.  [R. 330.]

[16] In January 2009, Dr. Brabham assessed a full scale IQ score of 63, verbal IQ score of 63, and performance IQ score of 68.  [R. 714.]

disregard of Plaintiff's IQ scores, in light of all other evidence of record, is not supported by substantial evidence.

### Physical or Other Mental Impairment

If the claimant's IQ falls within the range required by Listing 12.05C, then the inquiry is whether the claimant suffers from any additional physical or mental impairment significantly limiting work-related functions. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C; *Kennedy v. Heckler*, 739 F.2d 168, 172 (4th Cir. 1984). While a claimant may have previously been able to function in a work setting, Listing 12.05C anticipates that a claimant of limited intellectual ability will be more severely limited, and disabled, when faced with other severe impairments. *Davis*, 2008 WL 1826493, at *4. The "work-related limitation of function" requirement is satisfied when the claimant is determined to have a severe impairment at step two of the evaluation process. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00A (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)); *see also Luckey*, 890 F.2d at 669 (holding that a claimant satisfies the second prong of § 12.05C if the claimant has either an additional severe impairment or cannot perform his past relevant work). Because the ALJ found Plaintiff suffers from the "severe impairments" of status post lumbar discectomy and fusion and borderline intellectual functioning[17] [R. 26], the second prong of 12.05C is

---

[17]Plaintiff's career as a cement finisher ended due to problems with his right foot and a work-related injury to his lower back that required several surgeries. [R. 47, 654, 253, 711, 724–25.] He underwent surgery on his right foot on October 1, 2001. [R. 251–52.] Plaintiff also underwent a lumbar diskectomy surgery due to severe low back pain caused by a herniated disc at L5-S1. [R. 311, 550, 562.] In October 2003, he had a second back surgery with a fusion at L5-S1 with instrumentation. [R. 308–13.] He had an acute exacerbation of his back pain after he was involved in a car accident in April 2004. [R. 360.] In August 2005, Plaintiff underwent another spinal surgery for problems at the L4-5 level, and the hardware at L5-S1 was removed. [R. 487–98.]

After his back surgeries, Plaintiff continued to receive multiple treatments in doctors' offices and emergency rooms for chronic lower back pain. [R. 434–587.] His treating spinal surgeon, Eugene A. Eline, Jr., D.O., completed a Treating Physician's Statement form in May 2005, indicating that Plaintiff's back impairment significantly limited his physical ability to do basic work activities and that pain, fatigue, sleepiness,

satisfied.   Consequently, substantial evidence does not support the ALJ's finding that Plaintiff did not meet Listing 12.05C and that decision should be reversed.

**Treating Physician Opinions**

As this Court finds Plaintiff should have been found disabled at step three of the sequential evaluation process, the remainder of Plaintiff's allegations of error will not be discussed in detail.[18]   *See* 20 C.F.R. §§ 404.1520(a), 416.920(a)(4); *Hall*, 658 F.2d 260.

**The Court's Action**

Plaintiff argues that, upon a finding of reversible error, the Court has the authority to forego remand and make an outright award of benefits, citing *Forney v. Apfel*, 524 U.S. 266 (1998).  [Doc. 15 at 17.]

The decision of whether to remand or reverse rests within the sound discretion of the district court.   *Smith v. Astrue*, No. 3:10-66, 2011 WL 846833, at *3 (D.S.C. Mar. 7, 2011) (citing *Edwards v. Bowen*, 672 F. Supp. 230, 237 (E.D.N.C. 1987)).   A reversal and award of benefits is more appropriate when further proceedings would not serve any useful purpose.   *Kornock v. Harris*, 648 F.2d 525, 527 (9th Cir. 1985); *see Barry v. Bowen*, 862 F.2d 869, 1988 WL 124873, at *2 (4th Cir. 1988) (unpublished table decision) (citing *NLRB*

---

and side effects of pain medications related to the back condition significantly limited Plaintiff's ability to concentrate, remain alert, think clearly, or otherwise complete work tasks during an 8-hour workday.  [R. 499–500.]

[18]In the event the District Court determines that the Court should have addressed Plaintiff's complaint that the ALJ failed to discuss the weight given to the opinions offered by Drs. Eline and Richardson as to Plaintiff's physical impairments, the Court finds that the ALJ's analysis is contrary to established procedures.   The Commissioner argues that this failure is harmless because the opinions were conclusory.  [Doc. 16 at 23.] However, "our rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner."  SSR 96-5p, 61 Fed. Reg. 34,471-01, 34,472 (July 2, 1996).  Moreover, the ALJ "must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." *Id.* at 34,473.  In his evaluation, the ALJ must apply such factors in 20 C.F.R. § 404.1527(d) that are pertinent to the opinion. *Id.* Here, the ALJ failed to meet this standard; therefore, his opinion is not consistent with the established procedure.

*v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969)).  Remand serves no useful purpose

when  substantial evidence indicates that the claimant is disabled, *Parsons v. Heckler*, 739

F.2d 1334, 1341 (8th Cir. 1984), the weight of the evidence indicates that a remand would

only delay the receipt of benefits, *Tennant v. Schweiker*, 682 F.2d 707, 710 (8th Cir. 1982)

(citation omitted), a substantial amount of time has already passed, *Davis*, 2008 WLJ

1826493, at *5, and the Commissioner has had an opportunity to develop the record on

an outcome-determinative issue and has failed to produce substantial evidence, *Tennant,*

682 F.2d at 710–11; *Edwards*, 672 F. Supp. at 237.  Conversely, remand is appropriate

when there are defects to be remedied through the administrative proceedings. *Rodriguez*

*v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989).

A review of the record and relevant case law reveals that this matter should be

reversed and remanded for an award of benefits.  Plaintiff applied for benefits in February

2004, alleging an onset of disability in October 2003 [R. 165–68.], indicating a substantial

amount of time has passed since Plaintiff applied for benefits.[19]  Further, substantial

evidence on the record as a whole indicates that the claimant is disabled in accordance

with Listing 12.05C, and the weight of the evidence indicates that a remand would only

delay the receipt of benefits while serving no useful purpose because there is no additional

information to be developed in the record to remedy any defects.  Accordingly, in this case,

an outright award of benefits is appropriate.

---

[19]The Court notes Plaintiff initially filed claims for benefits on June 25, 2002 [R. 82]; Plaintiff has been trying
to receive benefits for almost nine years.

## **CONCLUSION**

Wherefore, based on the foregoing, it is recommended that, pursuant to the power of this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision under sentence four of 42 U.S.C. § 405(g) and § 1383(c)(3), the Commissioner's decision be REVERSED and the case be REMANDED to the Commissioner for an award of benefits to Plaintiff based on a disability commencing October 1, 2003.

IT IS SO RECOMMENDED.

s/Jacquelyn D. Austin
United States Magistrate Judge

May 25, 2011
Greenville, South Carolina